IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MIRANDA S. OSBORNE,

        Plaintiff,

    v.                               **Civil Action 2:17-cv-938**
                                          **Judge George C. Smith**
                                          **Magistrate Judge Jolson**

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Miranda S. Osborne, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II application for a period of disability and disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I.    BACKGROUND

### A.  Prior Proceedings

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on December 5, 2013, alleging disability since June 1, 2008. (Tr. 12, PAGEID #: 51). After Plaintiff's application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. (*Id.*).

Administrative Law Judge Edmund Giorgione held a hearing on February 29, 2016, but passed away before issuing a decision. (Tr. 51–72, PAGEID #: 90–111). Administrative Law Judge Timothy Gates (the "ALJ") held a supplemental hearing on July 21, 2016. (Tr. 34–50,

PAGEID #: 73–89).  On August 31, 2016, the ALJ issued a decision finding that Plaintiff was not disabled as defined in the Social Security Act from June 1, 2008 (the alleged onset date) through September 30, 2012 (the last date insured).  (Tr. 9–27, PAGEID #: 48–66).  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1, PAGEID #: 40).

Plaintiff filed this case on October 24, 2017 (Doc. 1), and the Commissioner filed the administrative record on February 14, 2018 (Doc. 6).  Plaintiff filed a Statement of Specific Errors (Doc. 9), the Commissioner responded (Doc. 12), and Plaintiff filed a Reply (Doc. 13).

### B.  Relevant Hearing Testimony

#### 1.  *February 29, 2016 Hearing*

Plaintiff testified that she was forty-eight years old at the time of the hearing, had completed high school, and is married.  (Tr. 56, PAGEID #: 95).  She last worked in 2007 as an assistant manager at a retail store.  (*Id.*).  Plaintiff testified that she stopped work when a supervisor mistreated her after returning from leave under the Family and Medical Leave Act.  (Tr. 58, 65, PAGEID #: 97, 104).

Plaintiff explained that her mental impairments prevent her from working.  (Tr. 57, PAGEID #: 96).  She stated:

> Well, sometimes I just can't get up.  I'm depressed and I may be crying or, I just can't go anyplace.  And if I do go places, sometimes I may be at a grocery store and I would feel like people's looking at me and I become paranoid and I get all, upset stomach and got to leave.  So, I have to, you know, go home to where I feel comfortable.

(*Id.*).

Plaintiff watches some television but is unable to sit for an extended period of time.  (Tr. 58, PAGEID #: 97).  Sometimes she can follow a television show, but other times she cannot.  (Tr.

59, PAGEID #: 98). Plaintiff plays golf once in a while, and also plays organ and guitar. (*Id.*). She showers daily, maintains a driver's license, and has no difficulty driving. (Tr. 59–60, PAGEID #: 98–99). She does household chores such as cooking, washing dishes, doing laundry, and vacuuming. (Tr. 60, PAGEID #: 99). Plaintiff's husband also does chores around the house. (*Id.*).

Plaintiff drinks approximately three to four 12-ounce cans of beer daily. (*Id.*). Her prescription medicine causes her to experience side effects, such as dry mouth and weight gain. (Tr. 60–61, PAGEID #: 99–100). She explained that she has to go the bathroom hourly due to the water she consumes for her dry mouth. (Tr. 60, PAGEID #: 99). Plaintiff leaves the house to attend doctor's appointments and to take her mother to the doctor. (Tr. 61–62, PAGEID #: 100–01).

Plaintiff testified that she suffers from paranoia once a month and that panic attacks can happen any moment, but typically occur once a week. (Tr. 62, PAGEID #: 101). She stated that she deals with depression weekly and that it can last all day and has the potential to produce crying spells, irritability, and decreased appetite. (Tr. 64–65, PAGEID #: 103–04). Plaintiff also testified that she suffers from memory issues since she stopped working and has trouble concentrating. (Tr. 67, PAGEID #: 106).

At the hearing, the ALJ asked vocational expert Connie O'Brien Heckler two hypothetical questions. As to the first hypothetical, the ALJ stated:

> I would like you to consider a hypothetical individual with the Claimant's age, education, and work experience. This hypothetical individual would not have any physical restrictions but would need to work in relative isolation defined as occasionally interacts with supervisors, infrequent and incidental contact with co-workers and that they need not to listen to or talk to co-workers to perform job tasks. No contact with the general public.

(Tr. 69, PAGEID #: 108). Ms. Heckler testified that, with these limitations, the hypothetical individual could not have performed Plaintiff's prior work, but the hypothetical individual could work as a floor waxer, store laborer, or dryer attendant. (*Id.*).

The ALJ then changed the hypothetical scenario, adding that the individual would not be able to maintain an eight-hour workday or a 40-hour workweek due to the inability to maintain attention and concentration. (Tr. 70, PAGEID #: 109). According to Ms. Heckler, these circumstances would be work preclusive. (*Id.*).

### 2. July 21, 2016 Supplemental Hearing

During her supplemental hearing, Plaintiff testified that from 1997 to 1999 she worked as a retail store manager prior to her position as an assistant manager at a different retail store. (Tr. 40–41, PAGEID #: 79–80). Plaintiff stated that she attends church, but not weekly, because she has a difficult time getting up due to her sleep medication. (Tr. 44, PAGEID #: 83). Plaintiff plays the organ in her church approximately once per month. (*Id.*).

During questioning by her attorney, Plaintiff elaborated on just how late her medication makes her sleep, stating "[s]ometimes I'll get up at 12:30 or 2:00 in the afternoon." (Tr. 45, PAGEID #: 84). She also testified that she has two to three "bad days" a week in which her symptoms worsen, and she gets out of bed only to use the restroom and eat. (*Id.*). Plaintiff identified her depression as the reason for her "bad days." (Tr. 46, PAGEID #: 85). Plaintiff testified that she also experiences panic attacks once a month. (Tr. 44, PAGEID #: 83).

The ALJ asked vocational expert Eric Pruitt ("the VE") to:

> assume a hypothetical individual [of] the Claimant's age and education and with the past jobs of Retail Store Manager, Retail Assistant Manager. Further assume this individual has the following mental limitations. Occasional interaction with co-workers, occasional interaction with the general public and occasional interaction with supervisors, with no other limitations.

(Tr. 47–48, PAGEID #: 86–87). The VE testified that, with these limitations, the hypothetical individual would not be able to perform Plaintiff's past work, but could work as an industrial cleaner, laundry worker, or machine packager. (Tr.48, PAGEID #: 87).

The ALJ then limited the individual to simple, routine tasks. (*Id*.). The VE concluded that the hypothetical individual could still complete the three jobs mentioned previously. (*Id*.). However, the VE opined that the hypothetical individual would be precluded from work if the individual: would be unable to work an eight-hour day or 40-hour work week; would be off task ten minutes every hour in addition to normal breaks; or would be absent three or more days per month. (Tr. 49, PAGEID #: 88).

### C. Relevant Medical Background

#### 1. *Scioto Paint Valley Mental Health Center*

Plaintiff's medical records begin with Dr. Daniel S. Lettvin about a year and a half prior to the alleged onset date and carry through the date last insured, including treatment by Dr. Lettvin, Dr. Susan E. Wolfe, and Dr. Chris Kovell. Dr. Wolfe's records and assessments are most relevant to Plaintiff's assignments of error.

Plaintiff's counseling sessions with Dr. Wolfe are documented from February 20, 2008 to September 15, 2010 (Tr. 443–61, PAGEID #: 488–506). On a Psychiatric/Psychological Impairment Questionnaire dated October 8, 2013, Dr. Wolfe indicated that she had been treating Plaintiff for bipolar II disorder and anxiety disorder since January 2007. (Tr. 477, PAGEID #: 522). Dr. Wolfe noted a current GAF of 50, with the lowest GAF of the past year being 47. (*Id*.) When asked to identify the laboratory and diagnostic test results which demonstrate support for her diagnosis, Dr. Wolfe stated, "see clinical records." (Tr. 478, PAGEID #: 523). Dr. Wolfe listed Plaintiff's primary symptoms as paranoia, depression, and anxiety. (Tr. 479, PAGEID #:

524).  Dr. Wolfe noted prior psychiatric hospitalizations in the early 1980s, 2001, and 2005.  (*Id.*).

On the questionnaire, Dr. Wolfe noted that Plaintiff was markedly limited in 13 of the 20 listed

mental activities, moderately limited in six, and mildly limited in one.  (Tr. 480–82, PAGEID #:

525–27).

Dr. Wolfe also completed a narrative statement for Plaintiff's counsel on April 11, 2014.

(Tr. 548, PAGEID #: 593).  She noted that Plaintiff still had intermittent episodes of paranoia but

had not identified any regular pattern or triggers for the paranoia episodes.  (*Id.*).  Dr. Wolfe

indicated that Plaintiff suffered from depression in between her episodes of paranoia.  (*Id.*).  Dr.

Wolfe also wrote that Plaintiff was "not able to perform full-time work as her symptoms interfere

with her ability to maintain the attention and emotional stability needed to maintain full-time

work."  (*Id.*).

Dr. Wolfe completed another Mental Impairment Questionnaire on April 11, 2016,

indicating that Plaintiff would miss work three times per month. (Tr. 883–86, PAGEID #: 929–

32).  She noted a diagnosis of Bipolar II disorder and stated that Plaintiff's most severe symptoms

were anxiety and depression.  (*Id.*).

### 2.  *Jamestown Family Medicine*

Dr. Kevin L. Sharrett has been Plaintiff's primary care physician since at least July 2010.

(Tr. 327, PAGEID #: 372).  Plaintiff primarily visited Dr. Sharrett for physical ailments, not mental

impairments.  (Tr. 327–55, PAGEID #: 372–400).  Dr. Sharrett noted that Plaintiff began weaning

herself off her anti-depressant in June 2012, without adverse effects.  (Tr. 352, PAGEID #: 397).

At a recheck in July 2012, Plaintiff informed Dr. Sharrett that, "she [was] feeling somewhat

anxious and [is] stopping her medication."  (Tr. 356, PAGEID #: 401).

Dr. Sharrett completed a Psychiatric/Psychological Impairment Questionnaire in January 2014, diagnosing Plaintiff with depression with bipolar tendencies and anxiety. (Tr. 518, PAGEID #: 563). Dr. Sharrett described Plaintiff's prognosis as "fair" because she had been stable on medication. (*Id.*). Dr. Sharrett opined that Plaintiff was moderately limited in 11 of the 20 mental activity categories listed and mildly limited in 9. (Tr. 520–23, PAGEID #: 565–68). Dr. Sharrett indicated that Plaintiff could tolerate low-level stress at work. (Tr. 524, PAGEID #: 569).

Dr. Sharrett likewise completed a Disability Impairment Questionnaire in February 2016. (Tr. 724, PAGEID #: 769). His diagnoses included anxiety, depression, alcohol abuse, altered mental state, behavioral disturbance, and psychosis/visual hallucinations. (*Id.*). When asked to estimate Plaintiff's ability to perform work in a competitive environment on a sustained and ongoing basis, he selected the option with the highest number of hours, noting that it was not medically necessary for Plaintiff to avoid continuous sitting in an 8-hour workday. (Tr. 726, PAGEID #: 771). Later in the questionnaire, however, he noted that Plaintiff's anxiety would be severe enough to interfere with her attention and concentration for 1/3 to 2/3 of an 8-hour workday, and she would need to take very frequent breaks that could last hours. (Tr. 727, PAGEID #: 772). Dr. Sharrett opined that Plaintiff's symptoms began in June 2008. (Tr. 728, PAGEID #: 773). He explained that she began treating with his office in July 2010, and that she "suffers from moderately severe mental illness manifested as depression, anxiety, and psychosis." (*Id.*). Finally, Dr. Sharrett opined that Plaintiff was "not able to work in a competitive work environment." (*Id.*).

### 3. TCN Behavioral Health

Plaintiff began seeing Licensed Nurse Practitioner Bobbie Fussichen in November 2013. (Tr. 487, PAGEID #: 532). After two appointments, Nurse Fussichen completed a Psychiatric/Psychological Impairment Questionnaire in January 2014. (Tr. 527–34, 572–79). Dr.

Franklin Halley co-signed the questionnaire, but his signature is undated. (Tr. 534, PAGEID #: 579). The questionnaire indicated that Plaintiff had a GAF of 65 and diagnoses of major depression, psychosis, and panic disorder without agoraphobia. (Tr. 527, PAGEID #: 572). Nurse Fussichen noted that Plaintiff was stable on medication at her first visit. (Tr. 528, PAGEID #: 573). Nurse Fussichen identified Plaintiff's primary symptoms as, "vivid weird dreams, anxious around people, loss of interest in things, [and] motivation varies." (Tr. 529, PAGEID #: 574). When rating Plaintiff's mental activity, Nurse Fussichen assigned Plaintiff a moderate limitation in eight out of 20 categories and a mild limitation in the other 12. (Tr. 530–32, PAGEID #: 575–77). Nurse Fussichen also indicated that Plaintiff could tolerate low-level stress at work. (Tr. 533, PAGEID #: 578).

Nurse Fussichen completed a Mental Impairment Questionnaire in 2016. (Tr. 878, PAGEID #: 924). She diagnosed Plaintiff with major depressive disorder, psychosis, and panic disorder. (*Id.*). She checked "yes" to indicate that Plaintiff experiences episodes of decompensation in a work or work-like setting, but she did not respond to the corresponding request for explanation. (Tr. 880, PAGEID #: 926). When completing a different mental activities assessment portion of the questionnaire, Nurse Fussichen indicated that Plaintiff suffers a moderate-to-marked limitation in 12 categories and a moderate limitation in 10 categories. (Tr. 881, PAGEID #: 927). Nurse Fussichen also indicated that Plaintiff's limitations dated back to June 2008, despite first treating Plaintiff in November 2013. (Tr. 882, PAGEID #: 928).

### 4. *State Agency Assessments*

On March 10, 2014, state agency psychologist Dr. Vicki Warren, Ph.D. opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes

of decompensation. (Tr. 77, PAGEID #: 117). Dr. Warren also opined that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence alone, especially in light of her activities of daily living. (Tr. 78, PAGEID #: 118). Ultimately, Dr. Warren found Plaintiff to be only partially credible. (*Id.*). State agency psychologist Dr. Deryck Richardson, Ph.D made identical findings at the reconsideration level on June 21, 2014. (Tr. 89–90, PAGEID #: 129–30).

### D. The ALJ's Decision

The ALJ determined that Plaintiff last met the insured status requirements on September 30, 2012, and she had not engaged in substantial gainful activity from June 1, 2008 (her alleged onset date) through September 30, 2012 (her date last insured). (Tr. 14, PAGEID #: 53). The ALJ found that Plaintiff suffered from the following severe impairments: affective disorder with psychotic features/psychotic disorder NOS, anxiety disorders, and alcohol dependence. (Tr. 15, PAGEID #: 54). However, the ALJ found that none of these impairments alone or in combination met or equaled a listed impairment. (*Id.*). More specifically, the ALJ found that Plaintiff's mental impairments did not meet Listing 12.03, 12.04, 12.06, and 12.09, because Plaintiff only had a mild restriction of activities of daily living, a moderate limitation in social functioning, a mild limitation in concentration, persistence, or pace, and no episodes of decompensation through the date last insured. (Tr. 15–16, PAGEID #: 54–55).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found that:

> [a]fter careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant could have occasional interaction with coworkers, occasional interaction with the general public, and occasional interaction with supervisors.

(Tr. 17, PAGEID #: 56).

Although the ALJ recognized that Dr. Wolfe was a treating source, he assigned little weight to Dr. Wolfe's opinions because they were unsupported by medically acceptable clinical or laboratory diagnostic evidence and inconsistent with other substantial evidence in the record. (Tr. 22–23, PAGEID #: 61–62). The ALJ likewise noted that Dr. Wolfe issued opinions on issues reserved to the Commissioner, and that such opinions could never be entitled to controlling weight. (Tr. 23, PAGEID #: 62).

The ALJ also assigned little weight to Dr. Sharrett's opinions because they were inconsistent with the evidence, including Dr. Sharrett's own treatment records. (*Id.*). Similarly, the ALJ assigned Nurse Fussichen's opinions little weight for a variety of reasons. The ALJ first determined that Nurse Fussichen was not an "acceptable medical source" pursuant to Social Security Ruling ("SSR") 06-3p. (*Id.*). Next, the ALJ observed that Nurse Fussichen did not evaluate Plaintiff until November 2013 and noted only moderate limitations, which is generally inconsistent with disability. (Tr. 23–24, PAGEID #: 62–63). Finally, the ALJ determined that Nurse Fussichen failed to support her assessments with specific, clinical evidence. (Tr. 24, PAGEID #: 63).

The ALJ assigned great weight to the State agency psychological consultants' mental assessments based on his determination that they were the most consistent with, and well supported by, the evidence during the relevant period. (*Id.*). The ALJ also assigned the GAF scores little weight because they "are not indicative of the claimant's day-to-day functioning in a work setting but rather represent a snapshot of the claimant's symptoms and functioning at the time of the rating." (Tr. 25, PAGEID #: 64).

The ALJ held that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity,

persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 18, PAGEID #: 57). The ALJ noted, however, that:

> the claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole. Nevertheless, in considering the criteria enumerated in the Regulations, Rulings, and case law for evaluating the claimant's subjective complaints, the evidence is inconsistent with an inability to perform the range of work assessed herein. The location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors are adequately addressed and accommodated in the residual functional capacity….

(Tr. 25, PAGEID #: 64). Based on Plaintiff's age, education, work experience, and RFC, the ALJ ultimately determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 26, PAGEID #: 65). Therefore, the ALJ held that Plaintiff was not under a disability, as defined in the Social Security Act, from the alleged onset date through the date last insured. (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.    DISCUSSION

Plaintiff asserts two assignments of error.  First, Plaintiff argues that the ALJ failed to weigh the medical opinion evidence properly.  Second, Plaintiff contends that the ALJ failed to evaluate her testimony properly.  (*See generally* Doc. 9).  The Court examines Plaintiff's arguments in turn.

### A.   Weighing the Medical Opinion Evidence

Plaintiff challenges the ALJ's decision to assign treating psychologist Dr. Wolfe, treating primary care physician Dr. Sharrett, and Nurse Fussichen less than controlling weight.  (*Id*. at 19–28).  Further, Plaintiff argues that "[t]he ALJ's reliance on the non-examining sources was particularly egregious[.]"  (*Id.* at 26).

As an initial matter, the undersigned notes that "[i]t is the Commissioner's function to resolve conflicts in the medical evidence[.]"  *Ray v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 718, 727 (S.D. Ohio 2013) (citing *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987)).  Accordingly, when medical sources rely on the same evidence and reach different conclusions, it is the ALJ's job to resolve the inconsistency.  *See, e.g.*, *Goodson v. Chater*, No. 95-6582, 1996 WL 338663, at *1 (6th Cir. June 17, 1996).  With this standard in mind, the undersigned turns to the opinions.

#### 1.  Dr. Wolfe

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule."  *Id.*  The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); 20 C.F.R. § 404.1527(c)(2). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

The ALJ afforded little weight to Dr. Wolfe's opinions, explaining that the opinions were "not well supported by medically acceptable clinical or laboratory diagnostic evidence nor are [they] [] consistent with other substantial evidence in the record." (Tr. 22–23, PAGEID # 61–62). The ALJ also found that certain conclusions in Dr. Wolfe's 2014 narrative statement—namely, that Plaintiff was unable to work—were not medical opinions, but rather were dispositive findings reserved to the Commissioner. (Tr. 23, PAGEID #: 62). It is well-settled that a statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner must find that the claimant is disabled. *Marvin v. Comm'r of Soc. Sec.*, No. 3:11 CV 2170, 2013 WL 518721, at *3 (N.D. Ohio Feb. 12, 2013) (citing 20 C.F.R. § 1527(d)(1)). "A Social Security Administration policy interpretation clarifies that, although statements that an individual is disabled are reserved for the Commissioner, such opinions *"must never be ignored"* and "notice of the determination or decision must explain the consideration given to the treating source's opinion." *Id.* (citing SSR 96–5p).

Here, the ALJ adequately explained the consideration given to Dr. Wolfe's opinion. First, Dr. Wolfe indicated on an assessment in 2013 that Plaintiff suffered from moderate to marked limitations in almost every single area of mental functioning, yet treatment records of Drs. Lettvin and Kovell documented improvement with medication and counseling. (*Id.*). Specifically, Dr. Kovell noted that Plaintiff's depression was in remission in January 2013; Dr. Kovell noted Plaintiff's improvement and stability in mood and functioning; and Plaintiff had a GAF score of 65 in November 2013 with consistently normal mental status exams. (Tr. 22, PAGEID #: 61).

The ALJ also explained that Plaintiff's mental status examinations were largely within normal limits; there was no evidence of active psychosis or paranoia; Plaintiff was active with family and friends and engaged in activities; and Plaintiff continued to use alcohol and decline treatment for alcohol despite treating sources consistently telling her to stop. (Tr. 23, PAGEID #: 62). Further, the ALJ noted that Dr. Wolfe's opinions appeared to be based heavily on Plaintiff's subjective complaints of symptoms and limitations, rather than objective, clinical findings. (*Id.*). Moreover, the ALJ found Dr. Wolfe's opinion to be "speculative and not supported by the evidence." (*Id.*). For example, Dr. Wolfe opined that Plaintiff was incapable of even "low stress" and would miss more than three days of work per month. (Tr. 22, PAGEID #: 61). Dr. Wolfe made a similar claim in 2016 regarding Plaintiff's missing work more than three days a month, despite notes in her own medical records that Plaintiff seemed to be doing well, was enjoying her new grandchild, and enjoyed gardening in the years between the two assessments. (Tr. 22, PAGEID #: 61).

Finally, the ALJ noted that Plaintiff declined treatment for alcohol and continued to use alcohol despite treating sources consistently telling her to stop. (Tr. 23, PAGEID #: 62). Plaintiff argues that the medical opinions of Dr. Wolfe "cannot be wholly rejected simply because Plaintiff

was advised to stop using alcohol." (Doc. 9 at 24). That, however, is not what the ALJ did. Although the ALJ recognized Plaintiff's alcohol abuse, and consistently noted it in reviewing the record, his analysis of the medical opinions did not in any way rely on Plaintiff's alcohol dependence. Thus, any argument by Plaintiff to the contrary is unpersuasive.

Ultimately, the ALJ provided an explicit rationale for the conclusions he reached, and the decision provided sufficient detail to satisfy the good-reasons requirement and appropriately explained the disposition of the case to Plaintiff. *See Henderson v. Astrue*, No. 10-CV-238-JMH, 2011 WL 3608164, at *3 (E.D. Ky. Aug. 16, 2011) (Good reasons include, *inter alia*, "a treating physician's opinion that contradicts other medical evidence in the record[.]"). Thus, the weight accorded by the ALJ to Dr. Wolfe was supported by substantial evidence.

### 2. Dr. Sharrett

The ALJ assigned Dr. Sharrett's opinions little weight because they were inconsistent with the medical evidence, including Dr. Sharrett's own treatment records. (Tr. 23, PAGEID #: 62). For example, Dr. Sharrett noted that Plaintiff's mental limitations would result in frequent absences or decompensation with moderate to severe stress. (Tr. 523, PAGEID #: 568). The ALJ held, however, that there was no evidence to support this conclusion because Plaintiff's mental status exams were within normal limits and largely stable through the date last insured. (Tr. 23, PAGEID #: 62). Indeed, Dr. Sharrett consistently noted in the "review of systems" that Plaintiff "[d]enies depression, anxiety, suicidal ideation or homicidal ideation." (Tr. 327–96, PAGEID #: 372–441). The ALJ acknowledged this in his summary of the medical record, writing, "these notes generally document no significant physical or mental symptoms or impairment. The claimant often denied notable symptoms. She did not present as significantly depressed or anxious." (Tr. 20, PAGEID #: 59).

Additionally, in a 2014 assessment, Dr. Sharrett noted only moderate to mild limits in mental functioning (Tr. 521–23, PAGEID #: 566–68), which the ALJ concluded was not entirely consistent with disabling mental impairments. (Tr. 23, PAGEID #: 62). Further, Dr. Sharrett opined that Plaintiff's symptoms were "fairly well controlled" by her medication (Tr. 607, PAGEID #: 652) and that any periods of worsening symptoms were caused by changes or discontinuation of medications where Plaintiff would then improve upon restarting or adjusting the medication (Tr. 352–68, PAGEID #: 397–412).

In sum, Dr. Sharrett provided inconsistent opinions. That the ALJ resolved these inconsistencies in a manner unfavorable to Plaintiff does not mean the ALJ's ultimate conclusion was unsupported by substantial evidence. It is the ALJ's "function to resolve conflicts in the evidence," *see Hardaway v. Sec of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987), which is what the ALJ did, while providing explicit rationales for the conclusions he reached. It was therefore not an error for the ALJ to assign Dr. Sharrett's opinion little weight.

### 3. Nurse Fussichen

Plaintiff next argues that the ALJ improperly evaluated Nurse Fussichen's opinions. (Doc. 9 at 28). As an initial matter, as a nurse practitioner, Nurse Fussichen is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03P; instead she is an "other source."[1] *See* SSR 06-03P (S.S.A.), 2006 SSR LEXIS 4, 2006 WL 2329939, at *2. "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function." *Id.* Ultimately, an ALJ "generally should explain the weight given to opinions from these 'other sources,' or

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Starr v. Comm'r of Soc. Sec.*, No. 2:12-CV-290, 2013 WL 653280, at *5 (S.D. Ohio Feb. 21, 2013)

Here, the ALJ assigned little weight to Nurse Fussichen's assessments for several reasons. First, the ALJ noted that Nurse Fussichen was not an acceptable medical source, and thus her opinion was "never entitled to controlling weight." (Tr. 23, PAGEID #: 62). Although Plaintiff argues that the ALJ failed to acknowledge that Dr. Halley co-signed one of the reports from Nurse Fussichen (Doc. 9 at 28 (citing Tr. 527–34)), this does not change the analysis. Dr. Halley may have signed the report, but he provided no explanation or clarification for presumably "signing on" to the opinion.

Second, Nurse Fussichen evaluated Plaintiff for the first time on November 22, 2013 (Tr. 493, PAGEID #: 538), more than a year after the date last insured. In order to qualify for disability insurance benefits, "a claimant must 'establish the onset of disability *prior* to the expiration or his [or her] insured status.'" *Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015) (quoting *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984) (citation omitted) (emphasis in original). Consequently, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (citations omitted). It was thus reasonable for the ALJ to discredit Nurse Fussichen's opinions based upon the timeframe in which they were offered.

Third, Nurse Fussichen noted only mild to moderate limitations in functioning (Tr. 530–32, PAGEID #: 575–77), which is generally inconsistent with disability. Finally, the ALJ found that Nurse Fussichen failed to support her assessments with specific, clinical evidence. In fact, the ALJ noted that Plaintiff's mental status examinations directly contradict Nurse Fussichen's

conclusions on her questionnaire, as Plaintiff's mental status examinations were consistently normal with the exception of the months surrounding her two psychiatric hospitalizations in 2014. (Tr. 584–88, 682–91, PAGEID #: 629–33, 727–36). In sum, the ALJ provided adequate reasons to assign little weight to Nurse Fussichen's opinions.

### 4. Non-Examining Physicians

Plaintiff argues that the ALJ's reliance on the non-examining sources—the state agency psychologists—was "particularly egregious." (Doc. 9 at 26). In support, Plaintiff argues that the first non-examining psychologist, Dr. Warren, reviewed Plaintiff's file on March 10, 2014, but it included medical records through only September 2012. (*Id.* (citing Tr. 76–79). Further, Plaintiff notes that the second psychologist, Dr. Richardson, failed to indicate if any additional evidence was reviewed. (*Id.* (citing Tr. 88–91)). According to Plaintiff these opinions are "of limited value" because the "non-examining sources did not review any of the opinions from the treating specialists as they were entered into the record at a later time." (*Id.*).

Of course, it is the job of the ALJ, not Plaintiff, to determine how much value and weight to assign certain medical opinions. Although "Social Security regulations specify that '[g]enerally,' the ALJ assigns 'more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you,'" there are exceptions. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting 20 C.F.R. § 404.1527(c)(1)). To be sure, state agency consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.* (quoting SSR 96–6p, 1996 WL 374180, at *2 (July 2, 1996)). "Thus, under certain circumstances, an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating or examining source." *Id.*

Here, the ALJ provided a detailed explanation for why he assigned the state agency psychologists great weight:

> [T]he undersigned gives great weight to the State agency psychological consultant's mental assessments, as these are the most consistent with and well supported by the evidence during the relevant prior. Evidence received after the State agency consultants rendered their assessments does not support greater limitation in the claimant's mental functioning during the relevant period. . . . In making this finding, the undersigned notes that the State agency consultants are well-qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to limitations. The State Agency consultants are deemed to possess specific "understanding of our disability programs and their evidentiary requirements" (Social Security Ruling 96-6p). Here, the consultants' assessments are consistent with and well supported by the evidence of the record as a whole and are accepted as an accurate representation of the claimant's mental status.

(Tr. 24, PAGEID #: 63).

When a non-examining source did not review a complete case record, as was the case here, "'we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion' from the non-examining source." *Miller*, 811 F.3d at 834 (quoting *Blakley*, 581 F.3d at 409). In this case, the ALJ acknowledged that additional evidence was received, but it did not support greater limitations. Thus, the ALJ's decision to assign great weight to the state agency psychologists was supported by substantial evidence.

At base, considering every medical opinion, along with the record evidence, the ALJ ultimately concluded that Plaintiff was not disabled. Even if the undersigned believed enough evidence existed to demonstrate Plaintiff's inability to work, as Plaintiff argues, the ALJ's decision may not be reversed simply because record evidence supports a different conclusion. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1996). Because it is the ALJ's "function to resolve conflicts in the evidence, *see Hardaway v. Sec' of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987)," and that is what the ALJ did here, the Court finds that substantial evidence supports the decision.

## B. Credibility Determination

Plaintiff argues that substantial evidence does not support the ALJ's evaluation of Ms. Osborne's testimony. (Doc. 9 at 30–32). Specifically, Plaintiff contends that the ALJ's "conclusory finding that [her] disability is not supported by the treatment records is directly contradicted by the record." (*Id.* at 31).

It is well established that the "subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *E.g.*, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). "Nevertheless, an ALJ is not *required* to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* (citations omitted). Recently enacted, SSR 16-3p eliminated the use of the term "credibility" and clarified that an ALJ should consider whether the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. 2016 WL 1119029 at *7.

Here, the ALJ stated explicitly that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record. (Tr. 18, PAGEID #: 57). For example, the ALJ noted that although Plaintiff quit her job around the time she began treatment for her bipolar and anxiety disorders, "she also remained quite active." (*Id*). The ALJ further relied on the fact that Plaintiff reported that she enjoyed activities with her family and friends, exercised regularly, performed projects around the house, hosted a wedding reception, attended a retirement dinner with her husband, performed chores, watched movies, gardened, and golfed. (Tr. 18–20, PAGEID #: 57–59 (citing Exhibit 2F)). Thus, it was reasonable for the ALJ to rely on Plaintiff's daily activities to find Plaintiff's statements about the intensity,

persistence, and limiting effects of her symptoms not consistent with the evidence of record. *See, e.g.*, *Blacha v. Sec'y of HHS*, 927 F.3d 228, 231 (6th Cir. 1990) (holding that the ALJ may consider a claimant's household and social activities when assessing credibility); *Murphy v. Comm'r of Soc. Sec.*, No. 2:13-cv-730, 2014 WL 5432125, *8 (S.D. Ohio Oct. 27, 2014) ("[A]n ALJ may take activities of daily living into account in making a credibility determination, especially if those activities appear inconsistent with Plaintiff's own reports of what she can and cannot do.").

Additionally, the ALJ found that clinical evidence documented only mild abnormalities. As Defendant explains:

> [T]he ALJ noted that Plaintiff "generally got along well with others," "socialized regularly with friends and family . . . [and] was able to get along with authority figures" (Tr. 15-16, 225-231). She denied having been fired from a job due to problems getting along with others (Tr. 16). Despite depression and anxiety, Plaintiff "was generally able to relate appropriately to treating and examining sources throughout the record. She was consistently cooperative without abnormal or unusual behaviors noted" (Tr. 16, 225-231, 289-326, 403-476). The ALJ also noted that Plaintiff "not exhibit concentration or attention deficits" and that "[d]uring the relevant period, the claimant did not exhibit active hallucinations, psychosis, or paranoia." (Tr. 16). Plaintiff had no evidence of a thought disorder, and "generally exhibited clear and coherent speech with fairly tight associations." (Tr. 16, 225-231, 289-326, 403-476).

(Doc. 12 at 19). These examples of clinical evidence from the record are in direct contradiction to Plaintiff's allegations of disabling symptomology. When an ALJ finds contradictions between medical reports and Plaintiff's complaints, "the ALJ may properly discount the credibility of the claimant." *Hartman v. Colvin*, 954 F. Supp. 2d 618, 636 (W.D. Ky. 2013).

The ALJ also noted that Plaintiff was actively looking for work (Tr. 18, PAGEID #: 57 (citing Exhibit 4F), which is inconsistent with a finding of disability. *See Smith v. Berryhill*, No. 3:15-CV-384, 2017 WL 929163, at *3 (S.D. Ohio Mar. 8, 2017) (affirming "the ALJ's decision to find Plaintiff's testimony not fully credible" based, in part, on the fact that Plaintiff was actively looking for work despite her contention that she was "unable to perform work activity").

Finally, the ALJ relied on the fact that Plaintiff's symptoms were well-controlled and showed improvement. The ALJ noted numerous examples, explaining that Plaintiff reported improvement in her symptoms in November 2007 when she cut back on alcohol (Tr. 18, PAGEID #: 57); she stated she was doing "fairly well" in May 2008 (*id.*); she reported improvement with her most recent medication adjustments in November 2008 (Tr. 19, PAGEID #: 58); counseling notes from January 2009 documented improvement following medication adjustments (*id.* (citing Exhibit 4F)); and she reported that she was doing well on multiple occasions, including in May 2009, September 2009, September 2010, and April 2012 (Tr. 19–21, PAGEID #: 58–60). It is permissible for an ALJ to consider this type of evidence. *See, e.g.*, *Dempley v. Astrue*, No. CIV.A.309CV651, 2010 WL 1979404, at *3 (W.D. Ky. May 14, 2010) (holding that an ALJ's credibility determination was supported by substantial evidence when the ALJ considered, *inter alia*, improvement in a plaintiff's symptoms).

At base, the Sixth Circuit has held that courts must accord great deference to an ALJ's "credibility" assessment, particularly "because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints." *Buxton*, 246 F.3d at 773 (citations omitted). To that end, it is not the province of the reviewing court to "try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In this case, the ALJ set forth the various factors that he considered in his credibility assessment, including specific citations to medical records, objective clinical findings, and Plaintiff's daily activities. Moreover, the ALJ's determination has support in the record. (*See* Tr. 15–20, PAGEID #: 54–59). Consequently, the ALJ complied with the regulations, and substantial evidence supports his decision.

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date:  July 24, 2018                                    /s/ Kimberly A. Jolson
                                                       KIMBERLY A. JOLSON
                                                       UNITED STATES MAGISTRATE JUDGE